AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| HARLAN KELLY | ) | Case No.3:20-mj-71739  MAG |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

**FILED**

Nov 25 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 26, 2016_____ in the county of _____San Francisco_____ in the _____Northern_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343, 1346 | Count One: Wire Fraud and Honest Services Wire Fraud |
| | Maximum Penalties: Maximum Prison Term of 20 Years; Maximum Fine of $250,000, or not more than the greater of twice the gross gain or twice the gross loss; Maximum Term of Supervised Release of Three Years; Mandatory Special Assessment of $100; and Forfeiture |

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent Tyler Nave

☑ Continued on the attached sheet.

Approved as to form *Scott Joiner*
AUSAS D. Ward, R. Harris, S. Joiner

Sworn to before me by telephone.

Date: _____November 25, 2020_____

City and state: _____San Francisco, CA_____

_____/s/_____
*Complainant's signature*

Special Agent Tyler Nave
*Printed name and title*

_____(signature)_____
*Judge's signature*

Hon. Thomas S. Hixson, U.S Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Tyler Nave, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state the following:

## I.        INTRODUCTION AND AGENT QUALIFICATIONS

1.        I make this affidavit in support of an application for a criminal complaint charging Harlan Kelly (KELLY) with one count of Honest Services Wire Fraud in violation of 18 U.S.C. §§ 1343, 1346.

1.        I am a Special Agent of the FBI and have been so employed since March 2009.  I am sworn and empowered to investigate criminal activity involving violations of federal law.  I am currently assigned to FBI's San Francisco Division Public Corruption Squad, which investigates abuse of public office in violation of criminal law, which includes fraud, bribery, extortion, conflicts of interest, and embezzlement. My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.        During my employment with the FBI, I have received formal classroom and field training at the FBI Academy in Quantico, Virginia and graduated from the New Agent Training program.  My training and experience includes, but is not limited to, public corruption, hate crimes, human trafficking, and foreign counter-intelligence.  I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's office and other federal agents who have done extensive work in the areas of financial crimes and public corruption.  I have participated in several investigations involving public corruption, bribery, and fraud, and I have been the lead agent on several of those cases. I have worked on multiple wiretaps while investigating public corruption, white-collar crime, and national security cases. I have received formal training in wiretaps at the FBI academy in Quantico, Virginia as well as on the job training while working on wiretaps in active investigations in multiple field offices.

1

3.    To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to, physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources. I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio and audio/video recording devices.

4.    I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information obtained from other law enforcement agents, documents and recorded conversations I have reviewed, and from witnesses and subjects of this investigation.

5.    Because this affidavit is being submitted for the purpose of establishing probable cause in support of the requested complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.  Rather, I have set forth only those facts I believe are necessary to establish probable cause and to provide the Court with an overview of the facts that establish that Harlan Kelly Jr., (KELLY), a public official, participated in a scheme to deprive the public of their right to the honest services of KELLY.

## II.    COUNT ONE: HONEST SERVICES WIRE FRAUD (18 U.S.C. §§ 1343, 1346)

6.    Beginning on a date unknown, but no later than September 2014, and continuing until on or about September 2019, in the Northern District of California and elsewhere, defendant KELLY knowingly, and with the intent to defraud, participated in, devised, and intended to device a scheme and artifice to defraud the public of its right to the honest services of a public official through bribery and kickbacks in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts. On or about March 26, 2016, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendant did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically, an American Express credit card charge made in Hong Kong, on an account established and addressed in San Francisco, in the Northern District of California, in violation of Title 18, United States Code, Sections 1343 and1346.

**a.  Relevant Law**

7.      Title 18, United States Code, §§ 1343 and 1346 prohibit honest services wire fraud.  The elements of this offense are as follows:

    a.  The defendant knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery or kickbacks;[1]

    b.  The defendant did so knowingly and with an intent to defraud, that is, the intent to deceive and cheat;

    c.  The scheme or artifice to defraud involved a misrepresentation, false statement, false pretense, or concealment of fact that was material; that is, the false statement, false pretense, or concealment of fact had a natural tendency to influence, or were capable of influencing, a person or entity's acts; and

    d.  The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

**III.    FACTS ESTABLISHING PROBABLE CAUSE**

**a.  Overview**

8.      The investigation has uncovered a long-running bribery scheme and corrupt partnership between KELLY and Walter Wong (WONG).  WONG is a San Francisco construction company executive and permit expediting consultant who runs or controls multiple entities that do business with the City of San Francisco.[2]  KELLY is the General Manager of the San Francisco Public Utilities Commission (PUC), a position he was appointed to in 2012.  Prior to his appointment to head the public utilities agency, KELLY was the Assistant General Manager, Infrastructure, responsible for implementing over $10 billion in capital improvements for water, sewer, and power.  KELLY is married to San Francisco's City Administrator, the highest non-elected position in the City, which oversees the General Services Agency, consisting of 25 departments, divisions and programs.

9.      As part of the scheme, WONG would provide items of value to KELLY in exchange for official actions by KELLY that benefitted or could benefit WONG's business ventures.  Their

---

[1] Honest services fraud does not require that the bribe or kickback be completed, or that official action was actually taken, because the criminal act is the creation of a "scheme" to defraud.

[2] WONG was charged by Information on June 23, 2020.  On July 6, 2020, he pleaded guilty to one count of Conspiracy to Commit Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346, 1349) and one count of Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)).  He is cooperating with the government pursuant to a cooperation plea agreement and is seeking sentencing consideration from the Court in the event that he provides substantial assistance to the investigation.

relationship was extensive and involved coded text messages, multiple international trips paid for or subsidized by WONG, cash exchanges, free meals, and even personal car service provided by WONG (or his employees at WONG's direction) to KELLY.

10.     As relevant to this criminal complaint, WONG paid travel and other expenses for KELLY and his family during a March 2016 vacation the KELLY family took to Hong Kong and China. These corrupt payments occurred while WONG was seeking a multi-million dollar contract from the PUC to convert thousands of San Francisco city streetlights to smart LED technology. Shortly after the bidding for that contract had ended, WONG performed extensive repair work on KELLY's personal residence, work which he provided to KELLY at a substantial discount, according to WONG's statements and documents I have reviewed.

11.     WONG told investigators that he provided benefits like these to KELLY because of KELLY's position at the PUC and the understanding that KELLY would, in return, use his official position to benefit WONG's business ventures, including WONG's attempts to win business from the PUC in connection with its ongoing efforts to convert to LED streetlights.

12.     In exchange for various items of value, KELLY used his official position to assist WONG's efforts, including by hand-delivering confidential internal PUC bid documents and information related to the LED project.  KELLY also used his official position to delay the deadline for bids on the LED contract in order to benefit WONG, who was behind in preparing his bid on the PUC contract.  KELLY communicated by text with WONG about KELLY's efforts to delay the deadline for bidding on the LED contract, stating in one text to WONG, as WONG was trying to prepare his bid, that the PUC was delaying the deadline.  Ten days later, as WONG was still preparing his bid, KELLY texted: "You told me [t]hat you had everything? I don't know what to do? I don't know how to stop the process anymore."  KELLY used his cell phone for these texts to WONG, rather than his official email, despite the fact that the subject matter related to official PUC business.

13.     KELLY and WONG communicated by WeChat while KELLY was in China on a family vacation that WONG arranged for and subsidized, and KELLY acknowledged the gifts he received from WONG.  In one text on April 2, 2016, KELLY thanked WONG for what he had done for KELLY and his family: "Thank you for the best family vacation ever! A little something for everyone!"

### a. Walter Wong/Harlan Kelly Relationship

14.     The facts described below focus on WONG's attempt to win business from PUC in connection with San Francisco's effort to convert more than 18,000 streetlights to smart LED technology, and a family trip to Hong Kong that WONG arranged and subsidized while his efforts to win the LED business were ongoing.  However, KELLY's corrupt dealings and communications with WONG throughout their relationship were also much broader, and demonstrate KELLY's intent to defraud San Francisco of the rights to his honest services.  In furtherance of their long-running corrupt scheme to defraud, WONG communicated with KELLY in private text messages, rather than through KELLY's official PUC email account, about a number of projects.

15.     For example, on March 4, 2014, WONG texted KELLY, "Just finished mayor breakfast p's call me, lots of delevoper [sic] complaint your department."

16.     On March 6, 2014, WONG texted KELLY: "1111 California, p/a # 201008199171. This is a good example is a revised plan. PUC approved before but not willing to review and resign."  After KELLY did not respond, WONG again texted four hours later:

WONG:     did u request help to this permit 1111 California, p/a # 201008199171. this one is in 35 radar

KELLY:     Yes have people working on ot.

WONG:     tks

17.     The reference to "35" was a code that WONG and KELLY used to refer to a former San Francisco mayor.  The number 35 corresponds to the letters for the official's initials on a numeric telephone keypad.  I have seen coded references to "35" as early as 2013 in text messages between KELLY and WONG.  For example, on May 31, 2013, WONG texted KELLY "ps let me know Sunday what time, do u want to meet at lunch time."  KELLY responded "Yes with 35."  WONG replied "35 may play golf tomorrow, he said for me to meet w u first, what time tomorrow is good for u."

18.     A similar exchange occurred in July 2014:

7/28/14

WONG: 35 will be at cc [Citi Center, the name of WONG's office building] 7 pm tomorrow

5

7/29/14

KELLY: Still on at 7?

WONG: yes we are at cc boss is here too

**b**.    **San Francisco LED Smart Lights Project**

19.    In September 2014, the City of San Francisco issued a Request for Proposals (RFP) for a multi-million dollar contract to provide a "smart" LED lighting system for San Francisco city streets that could be controlled remotely ("LED Luminaries With Wireless Network Control System.").  After several addendums to the RFP and several delays (at least one of which appears to have been engineered by KELLY to benefit WONG), the deadline for submitting bids was set for March 2, 2015.

20.    WONG sought to bid on the LED RFP contract through Green Source Trading LLC., a company he ran through his son.  WONG and KELLY repeatedly communicated about this project before it was bid, and KELLY provided WONG with confidential non-public information related to the bid.  Text messages sent and received between WONG and KELLY which I have reviewed corroborate the information that WONG provided to investigators about obtaining helpful inside PUC information from KELLY throughout the extended bid process for the LED contract.

21.    According to statements WONG has made to investigators, at this time in his relationship with KELLY, WONG had already provided free or subsidized travel and covered expenses for KELLY during multiple trips to China.  He had also done the same for the then-Director of San Francisco Public Works (DPW), Mohammed Nuru and for other San Francisco public officials.  According to WONG, in part based on the corrupt relationship he had established with KELLY and Nuru during these trips, he then received public contracts from both DPW and PUC based on official acts and influence exercised by KELLY and Nuru, including a 2013 pilot project with DPW, and a second 2014 project with the PUC.  WONG's companies, Green Source Trading LLC and later, Alternate Choice LLC., also participated in a program to provide DPW (and later the PUC) with holiday lights in the shapes of bells and snowflakes.

        **i.**    **LED Pre-Bid Information Sharing Between WONG and KELLY**

22.    On September 16, 2014, the PUC issued RFP 79002 - Request for Proposals for LED

Luminaires with Wireless Network Control System.[3]  A pre-proposal conference was set for September 30, 2014 with proposals due by October 27, 2014.  The due dates were subject to change and did in fact change several times.

23.     The following day, on September 17, 2014, KELLY texted WONG: "Yes we finally got it out.  Keep me posted on you your proposal.( any problems). Panel is the next step."  WONG replied: "Ok see you tomorrow."

24.     On November 21, 2014, the RFP was amended and reissued as RFP 79002-A. In the first week of November 2014, text messages indicate that KELLY and WONG attempted to meet in person. After a missed meeting on November 4, 2014, they arranged by text message to meet at WONG's office restaurant on November 5, 2014:

| | |
|---|---|
| KELLY: | Hey Mr. W lunch today? I forgot that we were meeting yesterday, sorry |
| WONG: | lunch is ok can we meet 11:30 |
| KELLY: | Where to meet? |
| WONG: | Citi center [the name of the building WONG owns] cafe [sic] the best restaurant in town |
| KELLY: | I will take a cab over there. 11:45 |

25.     On November 11, 2014, KELLY texted WONG "I need to give you a document."

26.     On November 13, 2014, before the amended smart LED RFP was publicly released, WONG and KELLY arranged by text message for KELLY to deliver documents to WONG:

WONG: do u have time to meet today

KELLY: I have the docs. Send someone over to pick up.

WONG: ok ps give me address do u have 77o info too

KELLY: 525 golden gate [the address of KELLY's office at the PUC] call me when they are down stairs. Yes 770 is included.

27.     Subsequent text messages indicate that KELLY sent someone down to deliver the documents to WONG.  WONG then texted KELLY "Pick up from front desk."  KELLY responded

---

[3] http://mission.sfgov.org/oca_bid_attachments/FA36574.pdf

"Call me after u read the docs."

28.    WONG provided investigators with confidential documents containing inside information that he received from KELLY at different times during the bid process.  Among the materials WONG received from KELLY is a PUC memorandum titled "RFP 79002 Bid Review," dated November 4, 2014 (about one week prior to WONG picking up a package of documents at KELLY's office and the day before they met for lunch on November 5, 2014).  The RFP number matches the LED RFP described above.  The memo purports to "analyze[] the reasons for the variance between actual pricing and anticipated pricing for RFP 79002 - LED Street Lights with a Wireless Control System."  It described the history of the LED project and the foundations of the PUC's cost estimate.  Among other things, the memo provided tables summarizing and ranking the cost proposals for the 31 bids received by the PUC for the September RFP, identifying the bidder by name, the type of LED fixture used in the bid, the type of control used in the bid, and the costs associated with each LED fixture and control for each bid.  The total costs of the bids ranged from $4.8 million to almost $11.5 million.

29.    Later on November 13, 2014, KELLY texted WONG:

Re streetlights,

1. Al will triple check but we both believe the minimum quals are pass/fail.

2. The LBE [Local Business Entity] points apply at all stages of the evaluation that are subjective (as opposed to min quals which is objective) thus they apply to the raw score at the quality evaluation and cost evaluation stages.

3. There were 4 of 31 proposals that initially we thought did not pass min quals; however, now we believe we will salvage 2 of the 4 - maybe 3 proposals. Al can speak with Mary tomorrow and provide you more details.

WONG replied and thanked KELLY for the information.

30.    About a week later, on November 21, 2014, the PUC formally issued its amended RFP titled LED Luminaires with Wireless Network Control System, RFP 79002-A.  The RFP set a pre-proposal conference for December 11, 2014 and a new due date for proposals of January 9, 2015.  According to the amended RFP and a December 16, 2014 memorandum from the pre-proposal conference, the original RFP was reissued "to include the provisions of Chapter 14B, the City's Local

Business Enterprise (LBE) Ordinance" which would allow "firms that are certified by the Contract Monitoring Division to claim a 10% rating bonus" as long as the LBE was "certified to provide the same product or service that is described in the RFP."

### ii. KELLY Delays LED Bid Process to Aid WONG

31. Four days before proposals were due under the amended RFP, on January 5, 2015, KELLY texted WONG: "We are going to postpone the LED light date." He also provided WONG with a name and number of an individual in the East Bay who had attended the pre-proposal conference in December. WONG replied "Till when," to which KELLY responded: "Weeks." (The due date for the RFP was in fact delayed, as noted below.) Later that night, WONG and KELLY again exchanged text messages, and WONG informed KELLY "we also submit the LBE paper hope this can be final review from them hope u can help to check if they got a require Document."

32. On January 15, 2015, six days after the original due date for the recently amended RFP, WONG and KELLY exchanged the following texts about the project:

| | | |
|---|---|---|
| WONG: | Current LED RFP does not require any assembly in SF | |
| KELLY: | We legally can't require that. However, you can place that in the special consideration. Also one of the competitor already assemble in SF R u certified? | |
| WONG: | not yet | |
| KELLY: | Did u talk with [name of individual provided on January 5, 2015] | |
| WONG: | The control from France just received information from UL | |
| KELLY: | You told me That you had everything? I don't know what to do? I don't know how to stop the process anymore | |
| WONG: | Just talk to Frank will use existing control with UL to send in will call u after work | |
| KELLY: | Great! I will be in LA until Friday evening | |
| WONG: | Hope we can get together weekend | |
| KELLY: | 4 sure | |

33. Based on this text exchange, it appears that WONG was even further behind on the LED

1  project than KELLY initially thought.  When WONG texted KELLY on January 15, 2015, and told him

2  that he was still waiting on a "control" from UL in France and would not have it until the end of the

3  month, KELLY responded in exasperation: "You told me That you had everything? I don't know what to

4  do? I don't know how to stop the process anymore."  But his exasperation quickly turned to relief when

5  WONG informed him they would still be able to submit a proposal with the existing control, and he

6  happily agreed to meet with WONG on the weekend, texting back "4 sure."

7      34.    Based on my training and experience, and from facts gathered during this investigation

8  (including interviews with WONG), along with the context of this communication, I believe that at this

9  point KELLY had used his official position to delay the RFP process in order to assist WONG.  I further

10  believe that he did this in exchange for items of value that he had previously received from WONG and

11  that KELLY anticipated he would receive in the future.

12      35.    Based on my training and experience, as well as from information I have learned during

13  the course of this investigation, I believe it was a violation of San Francisco and PUC policies - and

14  highly inappropriate - for KELLY to be communicating in this manner with WONG and to be delivering

15  internal PUC bid documents to WONG surreptitiously while WONG was in the middle of submitting a

16  bid for a major contract from PUC.

17          **iii.    KELLY Again Provides WONG With Confidential Bid Information**

18      36.     KELLY and WONG appear to have continued to communicate about the LED RFP later

19  in the month.  On January 27, 2015, WONG texted KELLY "tech team reply, what you request is

20  possible, do u have time to go over what we find."  KELLY did not respond.

21      37.    On January 27, 2015, WONG texted "are you intown [sic]?"  KELLY replied "Yes, let

22  me get the specs."

23      38.    On January 30, 2015, WONG and KELLY had the following exchange:

24          WONG:      Good morning do u have a few minutes to catch up.

25          KELLY:      Ok can you send some one over to pick up specs

26          WONG:      yes what time

27                      who should we see

28      39.    A couple hours later, on the same day, the texts continued:

|   |   |   |
|---|---|---|
| 1 | WONG: | can we go to pick up package yet |
| 2 | KELLY: | Come now to my office |
| 3 | WONG: | what floor |
| 4 |  | on our way ps let u know what floor |
| 5 |  | Green Source Trading, LLC |

40.     Several hours after that, WONG texted KELLY "review info we have question ps let me know when can i call you."

41.     On February 19, 2015, RFP 79002-A was reissued with addendum number 5, setting a due date for proposals of March 2, 2015.

42.     On February 27, 2015, KELLY and WONG discussed the LBE issue by text message and arranged to meet for lunch the following day:

|   |   |   |
|---|---|---|
| 12 | WONG: | good morning, what time will you available tomorrow |
| 13 | KELLY: | Lunch? |
| 14 | WONG: | when today or tomorrow |
| 15 | KELLY: | Tomorrow |
| 16 | WONG: | ok we got LBE thank you |
| 17 | KELLY: | Congrats! |

The following day they arranged by text message to meet at a well-known Chinese restaurant in San Francisco.

43.     In light of the amendment to the RFP concerning LBE participation, and the preference that was to be given to LBEs under the revised RFP (as described in KELLY's previous text message), I believe WONG was giving notice to KELLY that because of the delay caused by the amendments to the RFP, WONG would now be qualified to bid on the LED project as an LBE in time for the new due date.

### iv.     KELLY Gives WONG Confidential Internal Bid Documents

44.     After bids for the Smart LED contract were submitted in March 2015, KELLY again provided WONG with confidential inside information on the bidding process.  Contained within the documents that KELLY provided WONG (which WONG in turn produced to investigators) are color hard copy spreadsheets titled "RFP 79002-A Controls System Score Sheet 1" for each panelist who was

ranking the bids.  The spreadsheets are dated either April 16, 2015, or April 17, 2015 (for some of the spreadsheets the column width appears to be too narrow for the date to have displayed when printed, but the April dates are the same for all the spreadsheets where a date appears).  There are also hand written notations to KELLY, which appear to be from the PUC project manager handling the LED RFP, as well as the individual panelists' scores for each category and sub category of the bids' control systems.

45.     WONG also produced an email which he said he originally received from KELLY in hard copy. The email is dated May 20, 2015, and is addressed to KELLY from the same PUC project manager who was handling the LED Smart Lights RFP.  The printout displays KELLY's name at the top of the header, indicating that KELLY printed the email himself before giving it to WONG.  The email, subject "LED RFP Follow Up Information," reads: "Hi Harlan, In preparation for our meeting on Friday I have attached a spreadsheet that will hopefully answer some of your outstanding questions about the controls systems. If there is any other data or info that would be helpful please let me know."  The title of the Excel spreadsheet attachment is "Harlan Summary."  WONG provided federal investigators with a copy of the spreadsheet.  The spreadsheet lists various costs and licensing fees for LED control software by different vendors and evaluates software and cellular data costs over a 15-year period. The top three ranked "controls systems" are also identified.

46.     Text messages between KELLY and WONG indicate that they met for meals at various times near when these documents were created: April 4, 2015; May 3, 2015 (for the mayor's birthday dinner); and June 2, 2015.  Based on the investigation and interviews with WONG, I believe the two also met on other occasions during the summer of 2015.  WONG told investigators that he always paid for KELLY's meals when they met.

47.     Insider PUC documents that KELLY secretly gave WONG and that WONG produced to investigators also include a hard copy spreadsheet titled "RFP 79002-A Summary Score Sheet" dated July 26, 2015, summarizing and ranking the scores for each bidder.  As with the documents described above, these spreadsheets also contain hand-written notes addressed to KELLY from the PUC project manager, including a sticky note to "Harlan" explaining that "a more elaborate version of this spreadsheet was sent to…OCA/City Hall in June."  There is also a note apologizing for black and white copies because the "color printer on 7 isn't working."

48.     Another hard copy spreadsheet provided by KELLY to WONG (and by WONG to investigators) is titled "Summary Score Sheet w/LBE Discount" and dated July 7, 2015.  It is accompanied by a sticky note from the same PUC project manager that states "Harlan, This is the final spreadsheet produced by [employee] for use by OCA [Office of Contract Administration]."  The spreadsheet also ranks bidders by their scores and highlights the top 10 bids, including LBE discounts. WONG's company was ranked near the bottom.

49.     At least one witness who worked for the City of San Francisco and is knowledgeable about San Francisco contracting requirements told us that the internal PUC documents described herein could generally only be disseminated to the public pursuant a Public Records Act request, followed by review by the City Attorney's Office and redactions of non-public information.  In addition, the witness stated that certain documents KELLY provided to WONG marked "Confidential – Draft" would not be disseminated publicly, even pursuant to a Public Records Act request.

50.     Based on my training and experience investigating public corruption cases, I know that providing one bidder with internal, non-public information about an upcoming bid distorts the competitive nature of the bidding process, and can allow a contractor to bid in a way that prevents the public agency from receiving the full financial benefits of a competitive bidding process, often resulting in inflated bids or higher costs to agencies and thus taxpayers.

51.     I believe all of the foregoing indicates that KELLY was using his official position to obtain confidential inside information from PUC employees about the bidding process that KELLY then secretly provided to WONG in hard copy while the bidding evaluation was still ongoing.  I also believe KELLY provided documents in hard copy, rather than by email, in order to avoid leaving behind an electronic paper trail.  I further believe that KELLY did this for WONG because of the items of value that WONG had already provided to him and would provide in the future

### v.     PUC Cancels 2015 Contract; Reissues Bid Requests in 2016

52.     In September 2015, the PUC decided not to award the contract to any bidder.  Instead, the PUC issued a new RFP for the project in September of 2016, this time as "TC 79004 LED LUMINAIRES."   Green Source Trading submitted its initial bid for this RFP on November 14, 2016.

53.     As before, KELLY again covertly provided hard copy internal PUC documents to

1    WONG in 2016. WONG has provided investigators with spreadsheets dated November 22, 2016, that

2    KELLY had arranged for hand delivery to WONG in the same manner as before.  These spreadsheets

3    are each marked "Confidential" and have a "Draft" watermark across them.  One spreadsheet is titled

4    "TC 79004 LED LUMINAIRES BID SCREENING OVERVIEW," and another is titled "TC 79004

5    LED LUMINAIRES SECTION 90 RESPONSIVE BID REVIEW." According to WONG, although his

6    bids were ultimately unsuccessful, these and other internal bid documents KELLY gave him throughout

7    the extended bidding process for both RFPs helped WONG obtain a competitive advantage in putting

8    together his revised bid and interacting with the PUC staff that would rank the bids and make

9    recommendations on which company would be awarded the contract.

10              **c.    WONG Arranges a Trip to Hong Kong for KELLY and Family**

11           54.    In March 2016, in the period between the 2015 and the 2016 Smart LED Lights RFPs,

12    WONG arranged personal travel to Hong Kong and China for KELLY and his family.  WONG paid for

13    incidentals during this trip for KELLY, his wife, mother-in-law, and two children. WONG confirmed

14    that he did so because of KELLY's position with PUC and KELLY's ability to use his official position

15    to benefit WONG's business ventures, including WONG's attempts to win business from PUC in

16    connection with its ongoing efforts to convert to LED streetlights. In exchange, WONG expected and

17    understood that KELLY would take official actions to benefit WONG's bids on public contracts.

18           55.    WONG said his practice, when arranging international travel for San Francisco public

19    officials like KELLY and Nuru, was to have the officials purchase their own airfare.  WONG would

20    then reimburse the officials in cash for the airfare in order to avoid leaving a paper trail for investigators.

21    When WONG reviewed his American Express credit card records from the trip, he also identified

22    expenses – including meals costing hundreds of dollars and jewelry – which WONG said he bought for

23    KELLY and his family.[4]  WONG told me he used both his American Express credit card ending in the

24

25              ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [4] For example, WONG's credit card records show a $418.95 purchase from Chow Tai Fook Jewelry Co.
26    in Hong Kong on March 25, 2016. Separately, an itinerary for KELLY's trip sent by WONG's assistant describes
      a half day city tour on the same day, including a visit to "the Jewelry Factory with its outlet for bargain
27    shopping." WONG was able to confirm for investigators that his standard practice would have been to pay for
      these types of expenses for individuals like KELLY (and Mohammed Nuru) anytime they traveled with him
28    overseas. Financial records encompassing the dates of the KELLYs trip to Hong Kong (discussed below)
      corroborate WONG's account.

digits 7-51005 and his Citi Advantage credit card ending in the digits 8980.

56.    Among the charges on WONG's American Express card, is a $615.41 (USD) charge at the Intercontinental HK Harbourside, Restaurant on March 26, 2016.  WONG told investigators that he paid for the $615.41 meal for the Kellys.  WONG did not remember the specifics of the meal, but he said the purpose of his organizing the trip was to spend money on the Kellys for things like meals and hotel rooms and, in turn, obtain official action from KELLY that would help WONG's business.

57.    In keeping with the purpose of the trip, WONG also said that he paid for the Kellys hotel stay.  On March 30, 2016, WONG's credit card shows a charge of $2,011.40 at the Mira Hotel in Hong Kong.  WONG said the group stayed in three rooms. KELLY and his wife stayed together in a room, the children and their grandmother had a room, and WONG had a room for himself.  Based on the number of nights and rooms for the traveling party, combined with the discounted rate WONG normally paid for rooms at this hotel, WONG told investigators that the $2,000-plus amount included his own stay as well as charges that he paid for the KELLY family stay.[5]

58.    As with the other expenses WONG incurred on the trip, he was not reimbursed by KELLY, nor did he request reimbursement for these costs.  He instead paid for these amounts (and would have paid other expenses on the trip) in exchange for KELLY's previous and anticipated official action on WONG's behalf.[6]

59.    On June 23, 2020, KELLY's spouse was interviewed by the FBI and asked about expense payments during the March 2016 Hong Kong trip.  She told the agents that she paid WONG a lot of money for the trip, and brought lots of cash on the trip to give to Rose Pak, a San Francisco political activist who they visited as part of the trip.  Investigators have reviewed bank records and have found only one $500 cash withdrawal from the Kelly's accounts in the weeks prior to the March 2016 Hong

---

[5] According to the Kellys' financial records that I and other FBI agents have reviewed, there is a March 30, 2016 charge for $1,390 for the Mira Hotel in Hong Kong.  WONG said he believed paid for everything. Based on the rate described by WONG, this amount is consistent with WONG paying for two rooms (one for KELLY and his wife and one for WONG) and KELLY's mother-in-law paying for her own room with the grandchildren.

[6] Based upon my training and experience, I know that credit card charges made overseas necessarily involve a wire transaction affecting interstate commerce or a foreign wire because the wire reflecting the charge travels from the point of sale terminal in the overseas location to the United States where it is processed for debit and payment to the customer, in this case WONG, who resides in the Northern District of California, and receives his credit card statements, both electronically and by mail, in the NDCA.

1  Kong trip, and one $400 withdrawal from KELLY's mother-in-law's account. Further, investigators

2  have found records showing that the KELLYs out-of-pocket expenses via their own credit or debit cards

3  while in Hong Kong and Macau totaled only $130.97, other than a charge paying for a portion of their

4  hotel bill. Because the Kellys' incurred almost no significant expenses on their own known credit or

5  debit cards during an extended international trip, I believe this corroborates WONG's statements that he

6  paid for thousands of dollars in incidental expenses for the Kellys during the trip. WONG's statements

7  to investigators are further corroborated by the encrypted thank you message from KELLY described

8  below.

9      60.    From electronic evidence I reviewed, I have learned that KELLY and WONG were

10  communicating while in Hong Kong using the Chinese message application WeChat.  In a text message

11  sent the day he was returning to the United States, on April 2, 2016, KELLY wrote to WONG: "Thank

12  you for the best family vacation ever! A little something for everyone!"  As with KELLY's other's

13  communications using his personal email and cell phone in furtherance of the scheme to defraud, I

14  believe KELLY's use of a personal, Chinese-based messaging application in these instances was an

15  attempt to conceal his communications and evidence of his corrupt intent to defraud the public of honest

16  services.  I further believe that KELLY's encrypted "thank you" to WONG corroborates WONG's

17  statements to investigators that WONG spent thousands of dollars on KELLY during the trip in

18  exchange for KELLY's anticipated official action benefitting WONG's businesses.

19      61.    Emails and other communications and documents also show that WONG arranged the

20  Kellys' flights to Hong Kong.  Text messages indicate that WONG used a credit card provided by

21  KELLY to purchase the tickets.  On March 1, 2016, WONG and KELLY exchanged the following text

22  messages:

23          WONG:      Is this flight ok for your group

24                     Mar 24 2016 SFO 12:55 arrive Hong Kong

25                     March 25 7 pm April 3 12:30 am arrive SFO April 2

26                     10 pm

27          KELLY:     Ok with me

28          WONG:      which credit card should we use ps give us a copy by fax 415 554 8805

1                can we meet tomorrow after work ?

2                can i call you

3        62.     Significantly, KELLY's bank accounts show an unexplained cash deposit of $1,800 on

4 April 29, 2016, just weeks after the Hong Kong trip.  The total is close to the amount that Kelly's family

5 paid for two of the Hong Kong flights ($1,706), according to documents, including bank account

6 statements and check ledgers, that I and other agents have reviewed.  The aforementioned deposit was

7 the largest cash deposit into KELLY's accounts since March 2014, and further corroborated WONG's

8 account that he would have reimbursed KELLY in cash for KELLY and his wife's airfare.

9        63.     State and local ethics and disclosure laws require officials like KELLY to (among other

10 things) report potential conflicts of interest and list the gifts they have received, including meals and

11 travel, every year on a document known as a Form 700.  Although KELLY's Form 700 disclosed a $55

12 breakfast he received from the San Francisco Chamber of Commerce on March 16, 2016, he never

13 disclosed any of the travel, accommodations, meals, or other items of value he received during his 2016

14 trip to Hong Kong and China.  I believe this is evidence of KELLY's intent to defraud and his desire to

15 hide the benefits he received from WONG.

16        64.     In September 2016, the LED lights contract was put out for rebid, and in November 2016,

17 WONG's company bid again.  According to WONG, the internal PUC documents that KELLY had

18 previously provided allowed WONG to adjust his bid to be more competitive.  In the end, WONG's

19 company placed much higher in the ranking to win the bid than it did previously, and according to

20 WONG, was allowed to participate in a run-off review.  However, WONG said that they decided to

21 withdraw from the process after the city made multiple changes to the contract requirements.  According

22 to WONG, after expressing frustration to Nuru about the changes, Nuru told him to forget about the

23 project because someone else had bribed KELLY with a much larger sum and WONG was not going to

24 win the RFP.

25        65.     In addition to the 2015 and 2016 LED Smart Lights bids, WONG's company, Green

26 Source Trading, had contracts with the PUC to provide LED Christmas snowflake lights in and around

27 Union Square and Market Street.  WONG told investigators he received contracts for holiday lights from

28 KELLY and Nuru, in exchange for the items of value that he provided to both public officials. KELLY

and WONG repeatedly communicated about this contract using KELLY's personal email account. For example, on March 1, 2019, and again on September 19, 2019, WONG sent KELLY a quote regarding snowflake LED rope lights to KELLY's personal email account. WONG sent these emails to KELLY's personal email, despite the fact that they contained documents and information related to their contract work for PUC, and KELLY is required by San Francisco's Sunshine Ordinance to use his official email for communications related to PUC business.

66.     Based on my training and experience, I believe KELLY's use of his personal email to communicate about official business provides additional probable cause to believe that WONG and KELLY engaged in the bribery scheme described above. By using his personal email to communicate about PUC business pertaining to LED lights contracts, KELLY ensured that these emails would not be preserved as San Francisco government records and would not therefore be subject to public record keeping and disclosure laws. As with KELLY's other's communications using his personal email and his cell phone (calls and texts) in furtherance of the honest services scheme to defraud, I believe KELLY's use of his personal devices and email in these instances is evidence of his corrupt intent to defraud the public of honest services.

### d.     WONG Pays for Water Damage Repair Work at KELLY's Residence

67.     In 2017, KELLY contracted with WONG to repair water damage to the KELLY residence. Walter Wong Construction invoiced KELLY $23,236 for the work. On August 11, 2017 WONG emailed KELLY stating that KELLY's insurance company would only cover $11,547. Ultimately, KELLY paid WONG only $11,547 for the repair work, according to WONG, and confirmed by billing records and checks from KELLY that I have reviewed. WONG stated that he never pressed KELLY to pay the remainder of the bill because he wished to provide KELLY with benefits in exchange for KELLY, as head of the PUC, directing business to WONG and his companies as KELLY had done in the past.

68.     KELLY has admitted that he knew he underpaid WONG for the water damage repair work. On May 21, 2020, WONG met with KELLY and, under the direction of law enforcement, surreptitiously recorded the conversation. During this conversation, WONG told KELLY that the FBI had seized WONG's records, and that WONG's attorneys were asking about the repair work on

1  KELLY's house.  KELLY admitted that he knew he underpaid WONG, stating: "*I only paid what my*
2  *insurance gave me, and my deductible. So on that one, if that's one you want me to pay, I'm willing to*
3  *pay.*"  KELLY then said: "*So it's not like you were giving me money. we were friends, you were helping*
4  *me, and the insurance company was telling me, that's too high, he's ripping you off. but I know you're*
5  *not ripping me off.*"

6       69.  During this conversation, KELLY said they should get a third-party estimate for the cost
7  of the unpaid work, saying: *"you can just say, you know, that number's disputed, and so Harlan's*
8  *saying one thing and you're saying something else."*  Further, in the recorded conversation, KELLY
9  denied not paying for his airline tickets to Hong Kong, and for other construction work WONG did on
10  KELLY's residence.  KELLY said he fully paid the construction bills he received from WONG, and
11  believed that he gave WONG his credit card to pay for tickets to Hong Kong.

12  **IV.**    **CONCLUSION AND REQUEST FOR SEALING**

13       70.  Based on the forgoing, I believe probable cause exists for the issuance of a criminal
14  complaint charging KELLY with one count of Honest Services Wire Fraud, in violation of 18 U.S.C. §§
15  1343 and 1346.  Based on the evidence above, I believe that KELLY violated his duty of honest services
16  to the City and County of San Francisco by providing WONG with internal bid documents, and non-
17  public information regarding a multi-million city contract in return for bribes and kickbacks, including
18  thousands of dollars of personal expenses WONG paid during KELLY's trip to Hong Kong, and
19  thousands of dollars of repair work WONG performed on KELLY's residence, for which KELLY never
20  paid.

21       71.  I further request that the Court order that all papers in support of this application,
22  including the affidavit, be sealed until further order of the Court.  These documents discuss an ongoing
23  criminal investigation that is neither public nor known to all of the targets of the investigation.
24  Accordingly, there is good cause to seal these documents because their premature disclosure may give
25  targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change
26  patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

27  / /

28  / /

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

_____
/s/
_____
TYLER NAVE
FBI Special Agent

Sworn to before me over the telephone and signed
by me pursuant to Fed.R.Crim.P 4.1 and 4(d)
this 25th  day of November, 2020.

_____
HON. THOMAS S. HIXSON
United States Magistrate Judge

20